**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| CONTINENTAL WESTERN INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )   Case No. 2:19-cv-2116 |
| CONCEPT AGRI-TEK, LLC f/k/a CONCEPT AG, LLC, | ) |
| a Missouri limited liability company; GREG CRIGLER; | ) |
| DAVID ALLEN HALL; THOMAS BURRELL; | ) |
| INTERNATIONAL TRUSTEE GROUP, LLC, | ) |
| a Tennessee limited liability company; | ) |
| TYRONE GRAYER; WALTER JACKSON; and | ) |
| MONIQUE JACKSON, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## COMPLAINT FOR DECLARATORY JUDGMENT

NOW COMES Plaintiff, Continental Western Insurance Company ("Continental Western"), by and through its attorney, Sean W. Martin of Carr Allison, and for its Complaint for Declaratory Judgment against Defendants, Concept Agri-Tek, LLC f/k/a Concept Ag, LLC ("Concept Ag"), Greg Crigler ("Crigler"), David Allen Hall ("Hall"), Thomas Burrell ("Burrell"), International Trustee Group, LLC ("ITG"), Tyrone Grayer ("Grayer"), Walter Jackson, and Monique Jackson, states as follows:

### THE PARTIES

1.       Continental Western is, and at all relevant times was, an insurance company organized under the laws of the State of Iowa with its principal place of business in Urbandale, Iowa.

2.       Concept Ag is, and at all relevant times was, a limited liability company organized under the laws of the State of Missouri with its principal place of business in Charleston, Missouri. Concept Ag is composed of the following members:

      a.      William Curtis III, who is, and at all relevant times was, a citizen of the State of Missouri, and

      b.      Eric E. Bohl, who is, and at all relevant times was, a citizen of the State of Missouri.

3.      Crigler is, and at all relevant times was, a citizen of the State of Missouri.

4.      Hall is, and at all relevant times was, a citizen of the State of Tennessee.

5.      Burrell is, and at all relevant times was, a citizen of the State of Tennessee.

6.      ITG is, and at all relevant times was, a limited liability company organized under the laws of the State of Tennessee with its principal place of business in Memphis, Tennessee. ITG is composed of the following members:

      a.      Hall, who is, and at all relevant times was, a citizen of the State of Tennessee, and

      b.      Burrell, who is, and at all relevant times was, a citizen of the State of Tennessee.

7.      Grayer is, and at all relevant times was, a citizen of the State of Mississippi.

8.      Walter Jackson is, and at all relevant times was, a citizen of the State of Mississippi.

9.      Monique Jackson is, and at all relevant times was, a citizen of the State of Mississippi.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

11.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of

the events giving rise to this action occurred in this judicial district.

12.     Additionally, venue is proper pursuant to 28 U.S.C. § 1391(b)(3) because there is no judicial district in which this action may otherwise be brought, and all Defendants are subject to this Court's personal jurisdiction.

## THE UNDERLYING LAWSUIT

13.     On April 19, 2018, Hall, Burrell, ITG, Grayer, Walter Jackson, and Monique Jackson (collectively, the "Underlying Plaintiffs") filed a Complaint against Concept Ag, Crigler, Stine Seed Company ("Stine Co."), Kevin Cooper ("Cooper"), Myron Stine, Kevin Ryan ("Ryan"), B&B, Inc. ("B&B"), AgriSelect, LLC ("AgriSelect"), unknown Stine Co. breeders, and unknown farmers and planters (collectively, the "Underlying Defendants"), in the United States District Court for the Western District of Tennessee, under case number 2:18-cv-02265-JTF-tmp.

14.     On September 25, 2018, the Underlying Plaintiffs filed a First Amended Complaint against the Underlying Defendants asserting claims for, among other things, violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961 *et seq.*, race discrimination, and fraud (the "*Hall* FAC" or "*Hall* Lawsuit").  (A true and correct copy of the *Hall* FAC is attached hereto as **Exhibit A** and incorporated herein by reference). The Underlying Plaintiffs also filed a corresponding RICO Filing Statement. (A true and correct copy of the RICO Filing Statement is attached hereto as **Exhibit B** and incorporated herein by reference).

15.     The *Hall* FAC alleges that the Underlying Defendants engaged in a "bait-and-switch" scheme involving fake Stine Co. soybean seeds and unnecessary seed treatment chemicals sold by Concept Ag and AgriSelect. The *Hall* FAC alleges that the alleged scheme was carried out primarily by Cooper and Crigler while the other Underlying Defendants still

knowingly participated in and benefited from the alleged scheme but had less active roles.

## THE PARTIES TO THE *HALL* FAC

16.    The *Hall* FAC alleges that Hall, Burrell, Grayer, Walter Jackson, and Monique Jackson are African American farmers who operate farming operations in Mississippi and "are believed to be considered by the United States Congress as qualifying as limited resource and socially disadvantaged farmers and/or ranchers." (Ex. A, ¶¶ 7, 9).

17.    The *Hall* FAC alleges that Stine Co. was, at all relevant times, the largest independent seed company in the United States and produced over 200 varieties of genetically modified soybean seeds. (Ex. A, ¶¶ 10, 11).

18.    The *Hall* FAC alleges that B&B was, at all relevant times, a company engaged in the "treating" of soybean seeds, and which was wholly owned by Cooper and was formed for the sole purpose of advancing the alleged scheme. (Ex. A, ¶¶ 17, 100, 120, 122-23, 126, 139, 141, 151, 154).

19.    The *Hall* FAC alleges that Concept Ag was, at all relevant times, a company engaged in the manufacture and sale of certain agricultural products, including seed treatment chemicals, and whose principal place of business was located at a warehouse in Sledge, Mississippi that the Underlying Defendants used to carry out the alleged scheme (the "Sledge Warehouse"). (Ex. A, ¶¶ 21, 30, 125, 129).

20.    The *Hall* FAC alleges that AgriSelect was, at all relevant times, a company engaged in the manufacture and sale of herbicides and agricultural fertilizers. (Ex. A, ¶ 20).

21.    The *Hall* FAC alleges that Cooper was, at all relevant times, a Stine Co. sales representative who operated in Tennessee and Mississippi. (Ex. A, ¶ 15, 151). The *Hall* FAC further alleges that Cooper was a sales representative and agent of AgriSelect, and that Cooper,

along with Crigler, "operated" ArgriSelect, B&B, and Concept Ag, and were also the "managers" of Concept Ag's "affairs." (Ex. A, ¶¶ 21, 30, 129, 135, 139).

22.     The *Hall* FAC alleges that Crigler was, at all relevant times, employed by and/or associated with Concept Ag. (Ex. A, ¶¶ 18, 128-129, 153). The *Hall* FAC further alleges that Crigler was the "manager" of Concept Ag's "affairs," and also that he "controlled" and "operated" the Sledge Warehouse and "had unfettered managerial control over Concept Ag's credit and distribution of seed treatment products." (Ex. A, ¶ 145).

23.     The *Hall* FAC alleges that Myron Stine and Ryan were, at all relevant times, employed by Stine Co.; Myron Stine as president and Ryan as a regional agronomist. (Ex. A, ¶¶ 70, 155-156).

## THE CLAIMS ASSERTED IN THE *HALL* FAC

24.     The *Hall* FAC alleges that Stine Co. was one of hundreds of exhibitors at the 67th Annual Mid-South Farm and Gin Show, held March 3-4, 2017, in Memphis, Tennessee (the "Farm and Gin Show"), and that Cooper was one of two Stine Co. sales representatives at the Farm and Gin Show soliciting attendees. (Ex. A, ¶¶ 3, 13, 22-23, 89).

25.     The *Hall* FAC alleges that on March 3, 2017, Walter Jackson and Grayer attended the Farm and Gin Show and visited a display booth belonging to Stine Co. where they met Cooper who held himself out to be a "District Sales Manager." (Ex. A, ¶¶ 22-24). The *Hall* FAC alleges that Cooper solicited Walter Jackson and Grayer to purchase Stine Co. soybean seeds and stated that Stine Co. had certain seed varieties suitable for the growing conditions in Mississippi "with good yield potential." (Ex. A, ¶¶ 24-25).

26.     The *Hall* FAC alleges that in April and May 2017, Cooper visited the Underlying Plaintiffs' farming operations in Mississippi and recommended they use Stine Co.'s 49LD02

variety of certified soybean seeds. (Ex. A, ¶¶ 36-37, 222). The *Hall* FAC alleges that after the Underlying Plaintiffs placed their orders with Cooper, he insisted that he be allowed to "treat" the seeds prior to their delivery through a company Cooper had just recently formed, i.e., B&B. (Ex. A, ¶¶ 30-31, 40).

27.     The *Hall* FAC alleges that the purported Stine Co. seeds that Walter Jackson purchased from Cooper germinated slowly and underperformed in comparison to other varieties planted under similar conditions.  (Ex. A, ¶¶ 32, 54-56, 63). The *Hall* FAC alleges that the seeds Hall, Burrell, and Grayer purchased from Cooper also germinated slowly and underperformed. (Ex. A, ¶¶ 49, 52, 64).

28.     The *Hall* FAC further alleges that Burrell's and Grayer's purported Stine Co. seeds produced yields of only 35 bushels or less per acre, with one 120-acre section where the purported Stine Co. seeds were planted producing yields of less than five bushels per acre and a germination rate of zero percent. (Ex. A, ¶ 64).

29.     The *Hall* FAC alleges that on or around October 15, 2017, Burrell placed a phone call to Stine Co.'s corporate headquarters and notified Myron Stine of the underperformance of the purported Stine Co. seeds Cooper had sold the Underlying Plaintiffs and also requested that Stine Co. conduct an investigation. (Ex. A, ¶¶ 69, 155-56).

30.     The *Hall* FAC alleges that on or around November 1, 2017, Cooper and Ryan met with Burrell and Hall at their farming operation in Rome, Mississippi at which time Ryan stated "you have a yield problem." (Ex. A, ¶¶ 70, 155). The *Hall* FAC further alleges that Ryan nonetheless refused to test the purported Stine Co. seeds and instructed Burrell to contact Mississippi State University for any testing. (Ex. A, ¶¶ 70-71, 155, 177).

31.     The *Hall* FAC alleges that on or around November 9, 2017, Burrell and Grayer

sent a sample of the purported Stine Co. seeds to Mississippi State University for testing, the results of which showed, among other things, a germination rate of zero percent. (Ex. A, ¶¶ 69, 73-74). The *Hall* FAC alleges that no one from Stine Co. made any effort to test the suspect Stine Co. seeds nor did anyone follow up on the Underlying Plaintiffs' claims after Ryan's November 1, 2017 visit to Burrell, Hall, and Grayer's farming operation. (Ex. A, ¶¶ 75, 157, 192).

32. The *Hall* FAC alleges that, at all relevant times, Stine Co. had a policy of using its sales representatives to not only solicit prospective customers and place orders but to also take credit applications, execute technology agreements, deliver orders, collect unused seed, mail invoices, and collect payments. (Ex. A, ¶¶ 14, 15). The *Hall* FAC further alleges that as a result of this policy, Cooper was essentially the only person with whom the Underlying Plaintiffs interacted throughout the sales process. (Ex. A, ¶¶ 4, 15-16, 140).

33. The *Hall* FAC alleges that after meeting with Walter Jackson and Burrell at the Farm and Gin Show, Cooper proceeded to solicit the Underlying Plaintiffs to purchase Stine Co. seeds and corresponding seed treatment chemicals at least 30 times and also convinced them to apply for credit with Stine Co. and enter into Stine Co. user agreements. (Ex. A, ¶¶ 3-4, 11, 26-28, 33-35, 95, 113, 116, 121, 152, 198-99). The *Hall* FAC alleges that as a result of Cooper's efforts, the Underlying Plaintiffs purchased approximately 2000 bushels of purported Stine Co. seed in addition to corresponding seed treatment chemicals. (Ex. A, ¶¶ 30, 40, 42, 84, 86).

34. The *Hall* FAC alleges that throughout June 2017 to February 2018, the Underlying Defendants sent communications to the Underlying Plaintiffs by way of email, text message, telephone, and/or mail demanding payment for the purported Stine Co. seeds and seed treatment chemicals Cooper had sold them, and that Hall and Walter Jackson, in particular, have

been subjected to "constant hounding and harassment" by the Underlying Defendants' collection agencies. (Ex. A, ¶¶ 51, 53, 75-79, 95-96, 106, 111, 113, 116, 121, 162, 175).

35.     The *Hall* FAC alleges that the Underlying Defendants' scheme manifested itself with Cooper receiving an order for Stine Co. seed and at the same time causing an equal amount of inferior seeds to be delivered to the Sledge Warehouse where they were "treated," which was ostensibly performed by B&B, using seed treatment chemicals sold by Concept Ag and AgriSelect and then "switched" by being placed into empty Stine Co. jumbo bags bearing labels of certification. (Ex. A, ¶¶ 15, 30, 40-41, 43-44, 48, 66-68, 80-82, 125, 143-145, 153).

36.     The *Hall* FAC alleges that the inferior seeds used in the alleged scheme originated from a stockpile Crigler had in Charleston, Missouri, and that the seeds were tolerant to the seed treatment chemicals sold by Concept Ag and Agriselect. The *Hall* FAC further alleges that the "treating" of the inferior seeds made them appear to be higher quality than they actually were. (Ex. A, ¶¶ 17, 81, 145). The *Hall* FAC further alleges that the real Stine Co. seeds previously held in the empty jumbo bags were sold to farmers who had access to seed trailers and did not require that the seeds be delivered in the jumbo bags. (Ex. A, ¶¶ 15, 30, 40, 43-44, 66-68, 80, 82).

37.     The *Hall* FAC alleges that the overall purpose of the alleged scheme was to induce the Underlying Plaintiffs into purchasing seeds that were worth only $8 per bushel for $55 per bushel in addition to unnecessary seed treatment chemicals that served no purpose other than to make the defective seeds appear to be higher quality than they actually were. (Ex. A, ¶¶ 83-84, 86, 90, 92, 98, 130-31, 171, 174-76, 183).

38.     The *Hall* FAC alleges that all of the Underlying Defendants had a *quid pro quo* relationship with one another, and also that "[e]ach [of the Underlying Defendants] conspired

and knowingly carried out his part of the activities (conspiracy) of the alleged scheme to defraud all [the Underlying Plaintiffs]." (Ex. A, ¶¶ 90, 97, 179-83, 236-237).

39.     The *Hall* FAC alleges that "[a]ll [the Underlying Defendants] did manifest a willingness directly or indirectly to participate in 'a pattern of racketeering activity' alleged and conspired together to do so with full knowledge that [the Underlying Plaintiffs] could suffer grievous loss in his property and business by [the Underlying Defendants'] conduct . . .." (Ex. A, ¶ 181). The *Hall* FAC further alleges that "all [the Underlying Defendants] knew the general nature of the conspiracy and that the conspiracy extended beyond their individual role." (Ex. A, ¶ 183).

40.     The *Hall* FAC alleges that Cooper and Crigler represented the other Underlying Defendants in carrying out the alleged scheme, and that they "were stopped, bent and resolute on criminal activity and seized control of a [sic] previously legitimate firms [Stine Co., Concept Ag, and AgriSelect] and use [sic] the firms' resources to perpetrate more extensive, and less discernible [sic], criminal acts than they could do on their own." (Ex. A, ¶¶ 85, 90, 92, 121, 138, 169, 172, 222-23).

41.     The *Hall* FAC alleges that Cooper provided the overall "direction" of the alleged scheme by using his position as a Stine Co. sales representative to trick the Underlying Plaintiffs into purchasing defective soybean seeds and unnecessary seed treatment chemicals and also convince them to apply for credit with Stine Co. and enter into Stine Co. user agreements. (Ex. A, ¶¶ 41, 87, 89, 121, 138, 143-44, 151-52, 170, 175, 201-02, 222-23). The *Hall* FAC further alleges that Cooper used his influence and control over B&B and AgriSelect to further the alleged scheme. (Ex. A, ¶¶ 84, 86, 90, 126, 141-42, 143-144, 171, 175).

42.     The *Hall* FAC alleges that Cooper profited from the alleged scheme through sales

commissions from Stine Co., income from selling the Stine Co. seeds meant for the Underlying Plaintiffs to other farmers, and income from B&B for "treating" of the defective seeds. (Ex. A, ¶¶ 99-101, 104, 120, 123, 126, 141, 143, 151, 171).

43.     The *Hall* FAC alleges that B&B is separately liable from Cooper despite Cooper being its sole member. (Ex. A, ¶ 154).

44.     The *Hall* FAC alleges that Crigler's role in the alleged scheme involved supplying the inferior soybean seeds that were switched out for the real Stine Co. seeds, operating the Sledge Warehouse where the "switching" occurred, and selling seed treatment chemicals, through Concept Ag, to Cooper and/or B&B used to "treat" the inferior seeds.

45.     The *Hall* FAC alleges that the Crigler knowingly participated in the "switching" that occurred at the Sledge Warehouse and "had absolute knowledge" the seed treatment chemicals sold to Cooper and/or B&B were being used in furtherance of the scheme. (Ex. A, ¶¶ 67, 80-82, 103, 125, 129, 145, 153) (Ex. A, ¶¶ 102-105, 124, 126-127, 143-144, 171, 175).

46.     The *Hall* FAC alleges that neither Cooper nor Crigler ever intended to deliver Stine Co. soybean seeds to the Underlying Plaintiffs and that Cooper took certain measures to conceal the fact that the Underlying Plaintiffs had been sold fake Stine Co. seeds, including visiting the Underlying Plaintiffs' farming operations in person, preemptively raising concerns about "over spraying" and "dicamba drift," and attempting to collect any leftover seeds before they could be tested. (Ex. A, ¶¶ 50, 53, 85, 93-94, 97, 169, 222-23).

47.     The *Hall* FAC alleges that Concept Ag's role in the alleged scheme involved selling seed treatment chemicals to Cooper and/or B&B used to "treat" the inferior seeds. (Ex. A, ¶¶ 67-68, 80-82, 84, 86, 90, 103, 111, 116, 126, 143-144, 171, 175). The *Hall* FAC further alleges that Concept Ag is vicariously liable for acts taken by Crigler in carrying out the alleged

scheme. (Ex. A, ¶¶ 104, 127-129).

48.     The *Hall* FAC alleges that Myron Stine and Ryan participated in the alleged scheme by refusing to test the purported Stine Co. seeds and attempting to collect payment from the Underlying Plaintiffs despite knowing they had been sold fake Stine Co. seeds. (Ex. A, ¶¶ 58-59, 70-72, 75, 106, 111, 116-117, 152, 155, 158-61, 163-164, 175-77). The *Hall* FAC further alleges that Stine Co. could have easily tested the purported Stine Co. seeds and that Myron Stine and Ryan refused to do so because they knew it could expose the alleged scheme. (Ex. A, ¶¶ 58-59, 70-72, 94, 155, 158-160, 177).

49.     The *Hall* FAC alleges that Stine Co. participated in the alleged scheme by implementing a policy calling for very little oversight of its sales representatives, including Cooper, and which made it possible for the alleged scheme to take place in the first instance. (Ex. A, ¶¶ 87, 89, 139-140, 163, 199-202, 216-217). The *Hall* FAC further alleges that Stine Co. was "reckless" in failing to supervise Cooper and is vicariously liable for his conduct in conjunction with the alleged scheme. (Ex. A, ¶¶ 98, 130-32).

50.     The *Hall* FAC alleges that AgriSelect's role in the alleged scheme involved selling seed treatment chemicals to B&B and/or Cooper used to "treat" the inferior seeds. The *Hall* FAC further alleges that AgriSelect was a direct beneficiary of the alleged scheme and is vicariously liable for Cooper's conduct in conjunction with the alleged scheme. (Ex. A, ¶¶ 133-35, 139, 141, 142). (Ex. A, ¶¶ 84, 86, 90, 126, 143-144, 171, 175).

51.     Counts I through VI of the *Hall* FAC are claims for violation the RICO Act based on the idea that the Underlying Defendants' alleged scheme constituted a RICO "enterprise" through which the Underlying Defendants performed a pattern of racketeering activity.

52.     Counts I and II of the *Hall* FAC allege that the Underlying Defendants violated 18

U.S.C. §§ 1341 and 1343 by committing mail and wire fraud. (Ex. A, ¶¶ 110-117).

53.     Count III of the *Hall* FAC alleges that the Underlying Defendants violated 18 U.S.C. § 1962(a) by investing in an enterprise using income derived from a pattern of racketeering activity or collection of an unlawful debt. (Ex. A, ¶¶ 118-135).

54.     Count IV of the *Hall* FAC alleges that the Underlying Defendants violated 18 U.S.C. § 1962(b) by acquiring interest in and/or maintaining control of an enterprise through a pattern of racketeering activity or collection of an unlawful debt in violation. (Ex. A, ¶¶ 136-147).

55.     Count V of the *Hall* FAC alleges that the Underlying Defendants violated 18 U.S.C. § 1962(c) by participating in the conduct of an enterprise with whom they were employed or associated through a pattern of racketeering activity or collection of an unlawful debt. (Ex. A, ¶¶ 148-165).

56.     Count VI of the *Hall* FAC alleges that the Underlying Defendants violated 18 U.S.C. § 1962(d) by conspiring with one another to violate 18 U.S.C. §§ 1962(a), (b), and (c). (Ex. A, ¶¶ 166-184).

57.     Count VII of the *Hall* FAC is a claim for race discrimination pursuant to 42 U.S.C. § 1981, and alleges that the Underlying Defendants' purported scheme operated to discriminate against the Underlying Plaintiffs on the basis of their race. (Ex. A, ¶¶ 185-95). Count VII further alleges that Myron Stine and Ryan's "categorical and absolute dismissal of the pleas and cries . . . from [the Underlying Plaintiffs] regarding the problems with [the so-called Stine Co. seeds] was a direct, blatant and intentional disregard for the safety and welfare of Black farmers and constitute [sic] a badge of incidences [sic] of slavery." (Ex. A, ¶ 191). Count VII also alleges that "the unlawful, intentional and blatant actions of all [the Underlying

Defendants] have caused all [the Underlying Plaintiffs] to suffer loses [sic] and have impeded their right in the leasehold interest in the land upon which inferior seeds and the application of other chemical [sic] to maintain those inferior seeds were planted." (Ex. A, ¶ 194).

58.     Count VIII of the *Hall* FAC asserts a claim for violation of the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq.*, alleging that the Underlying Defendants attempted to collect an unlawful debt by demanding payment for the so-called Stine Co. seeds and unnecessary seed treatment chemicals the Underlying Plaintiffs were fraudulently induced to purchase. (Ex. A, ¶¶ 196-206).

59.     Count IX of the *Hall* FAC is a claim for breach of contract and alleges that the Underlying Plaintiffs, on the one hand, and the Underlying Defendants, on the other hand, entered into valid and enforceable contracts in the form of applications for credit with Stine Co. and Stine Co. user agreements and that the Underlying Defendants breached these contracts by failing to deliver Stine Co. seeds to the Underlying Plaintiffs. (Ex. A, ¶¶ 207-213).

60.     Count X of the *Hall* FAC is a claim for tortious breach of contract and alleges that the Underlying Defendants' conduct set forth under Count IX "w[as] willful, intentional, wanton, reckless, tortious, and operated to cause [the Underlying Plaintiffs] losses and damages under circumstances [the Underlying Defendants] knew of and/or should have known and/or which occurred as a result of intentional conduct." (Ex. A, ¶ 215).

61.     Count XI of the *Hall* FAC is a claim for intentional misrepresentation/fraud and alleges that all of the Underlying Defendants are liable for the numerous false statements Cooper made to the Underlying Plaintiffs to induce them to purchase defective seeds and unnecessary seed treatment chemicals. (Ex. A, ¶¶ 219-228).

62.     Count XII of the *Hall* FAC is a claim for promissory estoppel, equitable estoppel,

and detrimental reliance, and alleges that each of the Underlying Defendants should be estopped from denying responsibility for any of the other Underlying Defendants wrongful acts. (Ex. A, ¶¶ 229-234).

63.     Count XIII of the *Hall* FAC is a claim for civil conspiracy and alleges that all of the Underlying Defendants conspired with one another in carrying out the supposed scheme. (Ex. A, ¶¶ 235-238).

64.     Count XIV of the *Hall* FAC is a claim for tortious interference with contractual relations, alleging that each of Underlying Defendants interfered with the contractual relations the other Underlying Defendants had with the Underlying Plaintiffs and did so without right or good cause and in bad faith. (Ex. A, ¶¶ 239-241).

65.     Counts I through XIV of the *Hall* FAC are all pleaded in the alternative and in addition to one another. (Ex. A, ¶¶ 8, 110, 115, 118, 136, 148, 166, 185, 196, 207, 214, 219, 229, 235, 239, 244).

66.     The *Hall* FAC alleges that as a result of the Underlying Defendants' misconduct the Underlying Plaintiffs have sustained losses and damages in the form of emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, lost income, lost revenue, lost profit, lost business opportunity, loss of earning capacity, and the costs of any medical or mental health treatment that may become necessary in the future. (Ex. A, ¶¶ 184, 244).

67.     The *Hall* FAC seeks pecuniary damages, punitive damages, and treble damages, as well as attorney fees, costs, pre-judgment interest, and post-judgment interest. (Ex. A, ¶ 244). The *Hall* FAC further seeks the imposition of joint and several liability. (Ex. A, Prayer for Relief).

## THE CONTINENTAL WESTERN INSURANCE POLICY

68.     Continental Western issued a multi-peril commercial lines insurance policy to

Concept Ag under policy number CDP 3102337-21, which provided coverage for the period of July 16, 2016 to July 16, 2017 (the "Policy"). (A true and accurate copy of the Policy is attached hereto as **Exhibit C** and incorporated herein by reference).

69.     The Policy includes commercial general liability ("CGL") coverage of $1,000,000 per "occurrence," subject to a general aggregate limit of $2,000,000, a products/completed operations aggregate limit of $2,000,000, and a $2,500 deductible per "occurrence" basis for "property damage." (*See* Ex. C, CWIC000169, 195-196).

70.     The Policy also includes commercial excess liability coverage of $1,000,000 per "occurrence," subject to a general aggregate limit of $1,000,000, a "personal and advertising injury" limit of $1,000,000 for any one person or organization, and a products/completed operations aggregate limit of $1,000,000. (*See* Ex. C, CWIC000335).

## COUNT I

## CRIGLER DOES NOT QUALIFY AS AN INSURED UNDER THE POLICY

71.     Continental Western adopts and realleges the allegations in paragraphs 1 through 70 of its Complaint for Declaratory Judgment as paragraph 71 of Count I of its Complaint for Declaratory Judgment as if fully set forth herein.

72.     The Policy provides, in relevant part, the following with respect to who qualifies as an insured under the terms of the Policy:

> **SECTION II – WHO IS AN INSURED**
>
> **1.**     If you are designated in the Declarations as:
>
>                            * * *
>
> **c.**     A limited liability company, you are an insured.  Your members are also insureds, but only with respect to the conduct of your business.  Your managers are insureds, but only with respect to their duties as your managers.

\* \* \*

**2.** Each of the following is also an insured:

    **a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

\* \* \*

(Ex. C, CWIC000183).

73. The Policy defines the term "employee," as follows:

**SECTION V – DEFINITIONS**

\* \* \*

**5.** "Employee" includes a "leased worker". Employee does not include a "temporary worker".

\* \* \*

(Ex. C, CWIC000187)

74. The Policy defines the terms "leased worker" and "temporary worker," as follows:

**SECTION V – DEFINITIONS**

\* \* \*

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

\* \* \*

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

\* \* \*

16

(Ex. C, CWIC000188-189).

75.     Concept Ag is the named insured listed in the Declarations and is designated as a limited liability company. (*See* Ex. C, CWIC000001, 169).

76.     The *Hall* FAC alleges that Crigler was, at all relevant times, employed by and/or associated with Concept Ag. (Ex. A, ¶¶ 18, 128-129, 153).

77.     The *Hall* FAC further alleges that Crigler was the "manager" of Concept Ag's "affairs," and "had unfettered managerial control over Concept Ag's credit and distribution of seed treatment products." (Ex. A, ¶ 145).

78.     The Policy provides coverage to Concept Ag's "managers," but only with respect to their duties as managers.

79.     The Policy also provides coverage to Concept Ag's "employees," but only for acts within the scope of their employment with Concept Ag or while performing duties related to the conduct of Concept Ag's business.

80.     To the extent that Crigler is considered Concept Ag's "manager," he does not qualify as an insured under the Policy for acts that do not pertain to his duties as such.

81.     To the extent that Crigler is considered Concept Ag's "employee," he does not qualify as an insured under the Policy for acts outside the scope of his employment with Concept Ag and unrelated to the conduct of Concept Ag's business.

82.     Crigler does not qualify as an insured under the Policy in connection with the *Hall* FAC because the claims asserted against him are premised on alleged nefarious acts that do not fall within the scope of Crigler's employment with Concept Ag, either as a "manager" or an "employee," and do not relate to the conduct of Concept Ag's business.

83.     Continental Western has and had no duty under the Policy to defend Crigler against the claims asserted in the *Hall* FAC or to indemnify him for any judgment or settlement

entered in the *Hall* Lawsuit.

84.   An actual controversy exists between Continental Western, Concept Ag, Crigler, Hall, Burrell, ITG, Grayer, Walter Jackson, and Monique Jackson, and by the terms and provisions of 28 U.S.C. § 2201, this Court is vested with the authority to declare the rights and liabilities of the parties hereto, and to grant such further and other relief as may be necessary.

WHEREFORE, Plaintiff, Continental Western, respectfully prays that this Honorable Court:

a.   Determine and adjudicate the rights and liabilities of the parties hereto with respect to the Policy;

b.   Find and declare that Crigler does not qualify as an insured under the Policy in connection with the *Hall* FAC;

c.   Find and declare that Continental Western has and had no duty under the Policy to defend Crigler against the claims asserted in the *Hall* FAC or to indemnify him for any judgment or settlement entered in the *Hall* Lawsuit; and

d.   Grant Continental Western such other and further relieve that the Court deems proper under the facts and circumstances.

## COUNT II

## NO "PROPERTY DAMAGE" CAUSED BY AN "OCCURRENCE" DURING THE POLICY PERIOD

85.   Continental Western adopts and realleges the allegations in paragraphs 1 through 84 of its Complaint for Declaratory Judgment as paragraph 85 of Count II of its Complaint for Declaratory Judgment as if fully set forth herein.

86.   The Policy provides, in relevant part, the following with respect to the CGL coverage afforded therein:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

* * *

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1.      **Insuring Agreement**

   **a.**      We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.  But:

   **(1)**      The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

   **(2)**      Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**.

   **b.**      This insurance applies to "bodily injury" and "property damage" only if:

   **(1)**      The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

   **(2)**      The "bodily injury" or "property damage" occurs during the policy period; and

   **(3)**      Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part.  If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or

resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

\* \* \*

(Ex. C, CWIC000175).

87.     The Policy defines the terms "bodily injury," "coverage territory," "occurrence," "property damage," and "suit," as follows:

**SECTION V – DEFINITIONS**

\* \* \*

**3.**     "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.**     "Coverage territory" means:

**a.**     The United States of America (including its territories and possessions), Puerto Rico and Canada;\*\*\*

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

\* \* \*

**13.**     "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

\* \* \*

**17.**     "Property damage" means:

**a.**     Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.**     Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

\* \* \*

**18.**   "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged.\*\*\*

\* \* \*

(Ex. C, CWIC000187-189).

88.   The Policy's CGL coverage part also incorporates the following endorsement:

**SEED MERCHANTS – COVERAGE FOR
ERRONEOUS DELIVERY OR MIXTURE (RESULTING
FAILURE OF SEED TO GERMINATE NOT INCLUDED)**

\* \* \*

**A.**   The following is added to Paragraph **1.** of **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages):**

**1.**   **Insuring Agreement**

Damages because of "property damage" include loss resulting from:

**a.**   The erroneous delivery of seed, which includes:

**(1)**   The failure to deliver seed;

**(2)**   The delivery of wrong seed; or

**(3)**   The delivery of seed at the wrong time or season; or

**b.**   An error in the mixture of seed.

**B.**   Exclusion **m. Damage to Impaired Property or Property Not Physically Injured** under **paragraph 2., Exclusions of COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILTY (Section I – Coverages)** does not apply to any "property damage" described in paragraph **A.** of this endorsement.

**C.**   The following is added to paragraph **2., Exclusions of COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages):**

### 2.    Exclusions

This insurance does not apply to "property damage" arising out of the failure of seed to germinate.

* * *

(Ex. C, CWIC000229) (hereinafter referred to as the "Seed Merchants Endorsement").

89.    The *Hall* FAC alleges that the Underlying Defendants' scheme deprived the Underlying Plaintiffs of the use of their land and caused them to sustain consequential economic damages due to the underperformance of the defective soybean seeds they were sold.

90.    The *Hall* FAC does not trigger the insuring agreement for the Policy's CGL coverage because to the extent that the *Hall* FAC alleges "property damage," as that term is defined in the Policy, it does not allege an "occurrence" during the policy period.

91.    Continental Western has and had no duty under the Policy to defend Concept Ag or Crigler against the claims asserted in the *Hall* Complaint or to indemnify Concept Ag or Crigler for any judgment or settlement entered in the *Hall* Lawsuit.

92.     An actual controversy exists between Continental Western, Concept Ag, Crigler, Hall, Burrell, ITG, Grayer, Walter Jackson, and Monique Jackson, and by the terms and provisions of 28 U.S.C. § 2201, this Court is vested with the authority to declare the rights and liabilities of the parties hereto, and to grant such further and other relief as may be necessary.

WHEREFORE, Plaintiff, Continental Western, respectfully prays that this Honorable Court:

a.    Determine and adjudicate the rights and liabilities of the parties hereto with respect to the Policy;

b.    Find and declare that the *Hall* FAC does not allege "property damage" caused by an "occurrence" during the policy period, and therefore does not trigger the Policy's CGL coverage;

c.    Find and declare that Continental Western has and had no duty under the

Policy to defend Concept Ag or Crigler against the claims asserted in the *Hall* Complaint or to indemnify Concept Ag or Crigler for any judgment or settlement entered in the *Hall* Lawsuit; and

d.     Grant Continental Western such other and further relieve that the Court deems proper under the facts and circumstances.

## COUNT III

## THE "DAMAGE TO PROPERTY" EXCLUSION BARS COVERAGE

93.     Continental Western adopts and realleges the allegations in paragraphs 1 through 92 of its Complaint for Declaratory Judgment as paragraph 93 of Count III of its Complaint for Declaratory Judgment as if fully set forth herein.

94.     The Policy's CGL coverage part incorporates the following exclusion relating to damage to property:

**2.     Exclusions**

This insurance does not apply to:

\* \* \*

**j.     Damage To Property**

"Property damage" to:

\* \* \*

**(4)**     Personal property in the care, custody or control of the insured.

\* \* \*

(Ex. C, CWIC000178) (hereinafter referred to as the "Damage to Your Property Exclusion").

95.     The *Hall* FAC alleges that the purported Stine Co. soybean seeds the Underlying Plaintiffs received were defective. (*See, e.g.*, Ex. A, ¶¶ ).

96.     Based on the allegations in the *Hall* FAC, any "property damage" to the seeds must have occurred while they were in the "care, custody or control" of one or more of the

Underlying Defendants, including Concept Ag and/or Crigler.

97.     Accordingly, to the extent that the *Hall* FAC alleges "property damage" to the seeds occurring while they were in the "care, custody, or control" of Concept Ag and/or Crigler, the Damage to Your Property Exclusion bars coverage.

98.     Continental Western has and had no duty under the Policy to defend Concept Ag or Crigler against the claims asserted in the *Hall* FAC or to indemnify them for any judgment or settlement entered in the *Hall* Lawsuit.

99.     An actual controversy exists between Continental Western, Concept Ag, Crigler, Hall, Burrell, ITG, Grayer, Walter Jackson, and Monique Jackson, and by the terms and provisions of 28 U.S.C. § 2201, this Court is vested with the authority to declare the rights and liabilities of the parties hereto, and to grant such further and other relief as may be necessary.

WHEREFORE, Plaintiff, Continental Western, respectfully prays that this Honorable Court:

a.   Determine and adjudicate the rights and liabilities of the parties hereto with respect to the Policy;

b.   Find and declare that the Damage to Your Property Exclusion bars coverage for the claims asserted in the *Hall* FAC;

c.   Find and declare that Continental Western has and had no duty under the Policy to defend Concept Ag or Crigler against the claims asserted in the *Hall* FAC or to indemnify Concept Ag or Crigler for any judgment or settlement entered in the *Hall* Lawsuit; and

d.   Grant Continental Western such other and further relieve that the Court deems proper under the facts and circumstances.

## COUNT IV

## THE "EXPECTED OR INTENDED INJURY" EXCLUSION BARS COVERAGE

100.    Continental Western adopts and realleges the allegations in paragraphs 1 through 99 of its Complaint for Declaratory Judgment as paragraph 100 of Count IV of its Complaint for

Declaratory Judgment as if fully set forth herein.

101.    The Policy's CGL coverage part incorporates the following exclusion relating to expected or intended injuries:

>    **2.    Exclusions**
>
>    This insurance does not apply to:
>
>    **a.    Expected Or Intended Injury**
>
>    "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.
>
>    * * *

(Ex. C, CWIC000176) (hereinafter referred to as the "Expected Injury Exclusion").

102.    All claims asserted against Concept Ag and Crigler in the *Hall* FAC are predicated on intentional conduct.

103.    The damages alleged in the *Hall* FAC were expected or intended from the standpoint of the Concept Ag and Crigler.

104.    Accordingly, the Expected Injury Exclusion bars coverage for the claims asserted in the *Hall* FAC.

105.    Continental Western has and had no duty under the Policy to defend Concept Ag or Crigler against the claims asserted in the *Hall* FAC, or to indemnify Concept Ag or Crigler for any judgment or settlement entered in the *Hall* Lawsuit.

106.    An actual controversy exists between Continental Western, Concept Ag, Crigler, Hall, Burrell, ITG, Grayer, Walter Jackson, and Monique Jackson, and by the terms and provisions of 28 U.S.C. § 2201, this Court is vested with the authority to declare the rights and liabilities of the parties hereto, and to grant such further and other relief as may be necessary.

WHEREFORE, Plaintiff, Continental Western, respectfully prays that this Honorable Court:

a.  Determine and adjudicate the rights and liabilities of the parties hereto with respect to the Policy;

b.  Find and declare that the Expected Injury Exclusion bars coverage for the claims asserted in the *Hall* FAC;

c.  Find and declare that Continental Western has and had no duty under the Policy to defend Concept Ag or Crigler against the claims asserted in the *Hall* FAC, or to indemnify Concept Ag or Crigler for any judgment or settlement entered in the *Hall* Lawsuit; and

d.  Grant Continental Western such other and further relieve that the Court deems proper under the facts and circumstances.

## COUNT V

## THE "DAMAGE TO IMPAIRED PROPERTY OR PROPERTY NOT PHYSICALLY INJURED" EXCLUSION BARS COVERAGE

107.  Continental Western adopts and realleges the allegations in paragraphs 1 through 106 of its Complaint for Declaratory Judgment as paragraph 107 of Count V of its Complaint for Declaratory Judgment as if fully set forth herein.

108.  The Policy's CGL coverage part incorporates the following exclusion:

**2.  Exclusions**

This insurance does not apply to:

**m.  Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)**  A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)**  A delay or failure by you or anyone acting on your behalf to perform a contractor agreement with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

\* \* \*

(Ex. C, CWIC000179) (hereinafter referred to as the "Impaired Property Exclusion").

109.   The Policy defines the terms "impaired property," "your product," and "your work," as follows:

## SECTION V – DEFINITIONS

\* \* \*

**8.**   "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   **a.**   It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   **b.**   You have failed to fulfill the terms of a contract or agreement.

   If such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

\* \* \*

**21.**   "Your product":

   **a.**   Means:

      **(1)**   Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

         **(a)**   You;

         **(b)**   Others trading under your name; or

         **(c)**   A person or organization whose business or assets you have acquired; and

      **(2)**    Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

   **b.**    Includes:

      **(1)**    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

      **(2)**    The providing of or failure to provide warnings or instructions.

   **c.**    Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.**    "Your work":

   **a.**    Means:

      **(1)**    Work or operations performed by you or on your behalf; and

      **(2)**    Materials, parts or equipment furnished in connection with such work or operations.

   **b.**    Includes:

      **(1)**    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

      **(2)**    The providing of or failure to provide warnings or instructions.

* * *

(Ex. C, CWIC000187, 189-190).

110.    The *Hall* FAC alleges that the Underlying Defendants' scheme deprived the Underlying Plaintiffs of the use of their land and caused them to sustain consequential economic damages due to the underperformance of the defective soybean seeds they were sold.

111.    The damages alleged in the *Hall* FAC arose out of the incorporation of defective soybean seeds into the Underlying Plaintiffs' land, which in this instance constitutes either

"impaired property," as this term is defined in the Policy, or property that has not been physically injured.

112.    Accordingly, to the extent that the damages alleged in the *Hall* FAC arose out of Concept Ag's "product" or "work", as these terms are defined in the Policy, the Impaired Property Exclusion bars coverage for the claims asserted in the *Hall* FAC.

113.    Continental Western has and had no duty under the Policy to defend Concept Ag or Crigler against the claims asserted in the *Hall* FAC, or to indemnify Concept Ag or Crigler for any judgment or settlement entered in the *Hall* Lawsuit.

114.    An actual controversy exists between Continental Western, Concept Ag, Crigler, Hall, Burrell, ITG, Grayer, Walter Jackson, and Monique Jackson, and by the terms and provisions of 28 U.S.C. § 2201, this Court is vested with the authority to declare the rights and liabilities of the parties hereto, and to grant such further and other relief as may be necessary.

WHEREFORE, Plaintiff, Continental Western, respectfully prays that this Honorable Court:

a.    Determine and adjudicate the rights and liabilities of the parties hereto with respect to the Policy;

b.    Find and declare that the Impaired Property Exclusion bars coverage for the claims asserted in the *Hall* FAC;

c.    Find and declare that Continental Western has and had no duty under the Policy to defend Concept Ag or Crigler against the claims asserted in the *Hall* FAC or to indemnify Concept Ag or Crigler for any judgment or settlement entered in the *Hall* Lawsuit; and

d.    Grant Continental Western such other and further relieve that the Court deems proper under the facts and circumstances.

## COUNT VI

## THE EXCLUSION IN THE SEED MERCHANTS ENDORSEMENT BARS COVERAGE

115.    Continental Western adopts and realleges the allegations in paragraphs 1 through

114 of its Complaint for Declaratory Judgment as paragraph 115 of Count VI of its Complaint for Declaratory Judgment as if fully set forth herein.

116.    The Policy's Seed Merchants Endorsement incorporates the following exclusion:

> **2.      Exclusions**
>
> This insurance does not apply to "property damage" arising out of the failure of seed to germinate.
>
> \* \* \*

(Ex. C, CWIC000229, hereinafter referred to as the Seed Merchants Exclusion).

117.    The *Hall* FAC alleges that the purported Stine Co. soybean seeds the Underlying Plaintiffs received germinated slowly and in some instances failed to germinate at all.

118.    To the extent that the *Hall* Complaint alleges "property damage" arising out of the failure of seed to germinate, the Seed Merchants Exclusion bars coverage.

119.     Continental Western has and had no duty under the Policy to defend Concept Ag or Crigler against the claims asserted in the *Hall* FAC or to indemnify Concept Ag or Crigler for any judgment or settlement entered in the *Hall* Lawsuit.

120.    An actual controversy exists between Continental Western, Concept Ag, Crigler, Hall, Burrell, ITG, Grayer, Walter Jackson, and Monique Jackson, and by the terms and provisions of 28 U.S.C. § 2201, this Court is vested with the authority to declare the rights and liabilities of the parties hereto, and to grant such further and other relief as may be necessary.

WHEREFORE, Plaintiff, Continental Western, respectfully prays that this Honorable Court:

a.      Determine and adjudicate the rights and liabilities of the parties hereto with respect to the Policy;

b.      Find and declare that the exclusion in the Seed Merchants Endorsement bars coverage for the claims asserted in the *Hall* FAC;

30

c.   Find and declare that Continental Western has and had no duty under the Policy to defend Concept Ag or Crigler against the claims asserted in the *Hall* FAC or to indemnify Concept Ag or Crigler for any judgment or settlement entered in the *Hall* Lawsuit; and

d.   Grant Continental Western such other and further relieve that the Court deems proper under the facts and circumstances.

## COUNT VII

## NO COMMERCIAL EXCESS LIABILITY COVERAGE

121.   Continental Western adopts and realleges the allegations in paragraphs 1 through 120 of its Complaint for Declaratory Judgment as paragraph 121 of Count VII of its Complaint for Declaratory Judgment as if fully set forth herein.

122.   The Policy provides, in relevant part, the following with respect to the commercial excess liability coverage afforded therein:

### COMMERCIAL EXCESS LIABILITY COVERAGE FORM

\* \* \*

**SECTION I – COVERAGES**

**1.   Insuring Agreement**

a.   We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "injury or damage" to which insurance provided under this Coverage Part applies.

We will have the right and duty to defend the insured against any "suit" seeking damages for such "injury or damage" when the applicable limits of "controlling underlying insurance" have been exhausted in accordance with the provisions of such "controlling underlying insurance".

When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other suit seeking damages for "injury or damage".

However, we will have no duty to defend the insured

31

against any suit seeking damages for which insurance under this policy does not apply.

At our discretion, we may investigate any "event" that may involve this insurance and settle any resultant claim or suit, for which we have the duty to defend.

But:

**(1)**    The amount we will pay for "ultimate net loss" is limited as described in Section **II** – Limits Of Insurance; and

**(2)**    Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under this Coverage Part.   However, if the policy of "controlling underlying insurance" specifies that limits are reduced by defense expenses, our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of defense expenses, judgments or settlements under this Coverage Part.

**b.**    This insurance applies to "injury or damage" that is subject to an applicable "retained limit".  If any other limit, such as, a sublimit, is specified in the "controlling underlying insurance", this insurance does not apply to "injury or damage" arising out of that exposure unless that limit is specified in the Declarations under the Schedule of "controlling underlying insurance".

\* \* \*

(Ex. C, CWIC000343).

123.   The Policy defines the terms "controlling underlying insurance," "event," and "injury or damage," as follows:

### SECTION IV – DEFINITIONS

**1.**    "Controlling underlying insurance" means any policy of insurance or self-insurance listed in the Declarations under the Schedule of "controlling underlying insurance".

\* \* \*

**3.** "Event" means an "occurrence", offense, accident, act, or other event to which the applicable "controlling underlying insurance" applies.

**4.** "Injury or damage" means any injury or damage, covered in the applicable "controlling underlying insurance" arising from an "event".

\* \* \*

(Ex. C, CWIC000347).

124. The Policy's CGL coverage part is listed in the Declarations as the "controlling underlying insurance." (*See* Ex. C, CWIC000336).

125. The Policy's commercial excess liability coverage is triggered only if the injury or damage at issue is covered under the Policy's CGL coverage part.

126. Accordingly, because the claims asserted in the *Hall* FAC are not covered under the Policy's CGL coverage part, they do not trigger the Policy's commercial excess liability coverage.

127. Continental Western has and had no duty under the Policy to defend Concept Ag or Crigler against the claims asserted in the *Hall* FAC or to indemnify Concept Ag or Crigler for any judgment or settlement entered in the *Hall* Lawsuit.

128. An actual controversy exists between Continental Western, Concept Ag, Crigler, Hall, Burrell, ITG, Grayer, Walter Jackson, and Monique Jackson, and by the terms and provisions of 28 U.S.C. § 2201, this Court is vested with the authority to declare the rights and liabilities of the parties hereto, and to grant such further and other relief as may be necessary.

WHEREFORE, Plaintiff, Continental Western, respectfully prays that this Honorable Court:

a. Determine and adjudicate the rights and liabilities of the parties hereto with respect to the Policy;

b.      Find and declare that because the claims asserted in the *Hall* FAC are not covered under the Policy's CGL coverage part they do not trigger the Policy's commercial excess liability coverage;

c.      Find and declare that Continental Western has and had no duty under the Policy to defend Concept Ag or Crigler against the claims asserted in the *Hall* FAC or to indemnify Concept Ag or Crigler for any judgment or settlement entered in the *Hall* Lawsuit; and

d.      Grant Continental Western such other and further relieve that the Court deems proper under the facts and circumstances.

## COUNT VIII

## PUNITIVE DAMAGES ARE SPECIFICALLY EXCLUDED UNDER THE POLICY

129.    Continental Western adopts and realleges the allegations in paragraphs 1 through 128 of its Complaint for Declaratory Judgment as paragraph 129 of Count VIII of its Complaint for Declaratory Judgment as if fully set forth herein.

130.    The Policy's commercial excess liability coverage part incorporates the following exclusion:

### EXCLUSION
### PUNITIVE DAMAGES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

This insurance does not apply to punitive or exemplary damages (including any multiple of compensatory damages, such as double or treble damages) awarded against the insured.

\* \* \*

(Ex. C, CWIC000339) (hereinafter referred to as the "Punitive Damages Exclusion").

131.    The *Hall* FAC seeks punitive damages as well as treble damages.

132.    The Punitive Damages Exclusion expressly bars coverage for any award of punitive damages or treble damages in the *Hall* Lawsuit.

133.    Continental Western has and had no duty under the Policy to defend Concept Ag

or Crigler against the claims asserted in the *Hall* FAC or to indemnify Concept Ag or Crigler for any judgment or settlement entered in the *Hall* Lawsuit.

134.    An actual controversy exists between Continental Western, Concept Ag, Crigler, Hall, Burrell, ITG, Grayer, Walter Jackson, and Monique Jackson, and by the terms and provisions of 28 U.S.C. § 2201, this Court is vested with the authority to declare the rights and liabilities of the parties hereto, and to grant such further and other relief as may be necessary.

WHEREFORE, Plaintiff, Continental Western, respectfully prays that this Honorable Court:

a.    Determine and adjudicate the rights and liabilities of the parties hereto with respect to the Policy;

b.    Find and declare that the Punitive Damages Exclusion bars coverage for any award of punitive damages or treble damages in the *Hall* Lawsuit;

c.    Find and declare that Continental Western has and had no duty under the Policy to defend Concept Ag or Crigler against the claims asserted in the *Hall* FAC or to indemnify Concept Ag or Crigler for any judgment or settlement entered in the *Hall* Lawsuit; and

d.    Grant Continental Western such other and further relieve that the Court deems proper under the facts and circumstances.

This the 15th day of February, 2019.

Respectfully submitted,

**CARR ALLISON**

By:  /s/ Sean W. Martin
**SEAN W. MARTIN, BPR #020870
ASHLEY B. GIBSON, BPR #34140**
*Attorneys for Plaintiff Continental Western
Insurance Company*
651 E. 4th Street, Suite 100
Chattanooga, TN 37403
(423) 648-9832 / (423) 648-9869 FAX
swmartin@carrallison.com
agibson@carrallison.com